## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| CHINA FALCON FLYING LIMITED,<br><br>Plaintiff,<br><br>v.<br><br>DASSAULT FALCON JET CORP.,<br><br>Defendant. | Civ. No. 15-6210 (KM) (MAH)<br><br>OPINION |

### KEVIN MCNULTY, U.S.D.J.:

Dassault Falcon Jet Corporation ("Dassault Jet") engaged China Falcon Flying Limited ("China Falcon"), owned and led by its principal Cheung "Michelle" Wang, to promote specific models of its Falcon series of aircraft in the Chinese business jet market. In return, China Falcon would receive a commission or finder's fee of about 2%–2.5% for each sale made in that market. The parties dispute the commissions on four sales of Falcon aircraft in China. Dassault Jet now moves for summary judgment in its favor. For the foregoing reasons, I will grant Dassault Jet's motion for summary judgment as to the claims of breach of contract for the sales of s/n 721, s/n 212, and s/n 244, but deny the motion as to the breach of contract claim for s/n 141. I will also deny Dassault Jet's motion for summary judgment as to the claims for breach of the implied covenant of good faith and fair dealing, but grant its motion for summary judgment as to the claims of unjust enrichment and quantum meruit.

1

I.     **Summary of Facts**[1]

On September 1, 2009, China Falcon and Dassault Jet entered into a Finder's Fee Agreement ("FFA"), which would expire on December 31, 2009. (Def. St. ¶ 1; Pl. Resp. ¶ 1.) Under this agreement, China Falcon would earn a 2.5% commission[2] on the sale of certain Falcon aircraft to two companies, Minsheng Bank and DeerJet. (Def. St. ¶ 2; Pl. Resp. ¶ 2.) The agreement contained language stating that this commission percentage could "be reduced proportionally, if the sale occur[red] at a price less than [Dassault Jet]'s current list price." (Def. St. ¶ 3; Pl. Resp. ¶ 3.) The agreement also conditioned the eligibility of China Falcon to receive a commission on certain events:

(a) the buyer had to "enter into and sign a binding and enforceable contract of sale with [Dassault Jet] for the purchase of one or more new Falcon aircraft on or before December 31, 2009"; and

---

[1]     Record items cited repeatedly will be abbreviated as follows:

| | |
|---|---|
| AC = | Redacted Amended Complaint (ECF No. 78/113) |
| Tor. Decl. = | Declaration of John M. Torriello re: Motion for Summary Judgment by Defendant and Exhibits (ECF nos. 99–100) |
| Def. St. = | Defendant's Statement of Material Facts Not in Dispute Pursuant to Local Civil Rule 56.1 (ECF no. 103) |
| Def. Br. = | Memorandum of Law in Support of Defendant's Motion for Summary Judgment (ECF no. 104) |
| Pl. Opp. = | Plaintiff's Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment (ECF no. 109) |
| Pl. Resp. = | Plaintiff's Response to Defendant's State of Material Facts Not in Dispute (ECF no. 109, ex. 38, pp. 2–17) |
| Pl. St. = | Plaintiff's Supplemental Statement of Dispute Material Facts Pursuant to Local Civil Rule 56.1 (ECF no. 109, ex. 38, pp. 17–38) |
| Klein Decl. = | Declaration of Sarah Klein, Esq. and Exhibits (ECF no. 109) |
| Def. Reply = | Reply Memorandum of Law in Further Support of Defendant's Motion for Summary Judgment ECF no. 117) |
| Def. Resp. = | Defendant's Response to Plaintiff's Supplemental State of Disputed Material Facts (ECF no. 118) |

[2]     The parties use the terms "finder's fee" and "commission" interchangeably to describe the concept of collecting a percentage of the sale price of an aircraft.

2

(b) "the buyer who enters into the contract of sale must [1] complete the acquisition, [2] fully pay for and [3] take title to the aircraft in accordance with the terms of the contract." (Def. St. ¶ 4; Pl. Resp. ¶ 4 ([bracketed] numbers added.)

China Falcon disputes, however, that the parties actually acted in accordance with these provisions. It claims that through a course of dealing it was understood that China Falcon became eligible to receive its commission upon the completion of condition (a), *supra*, only (i.e., the signing of the purchase agreement) only. (Pl. Resp. ¶¶ 3–4.) The parties also dispute China Falcon's exact role in the execution of purchase agreements and the events after the signing those agreements. (Pl. St. ¶¶ 13–14; Def. Resp. ¶¶ 13–14.)

The FFA was first amended in January 2010. That amendment extended the duration of the FFA to December 31, 2011, if either Minsheng Bank or DeerJet purchased five Falcon aircraft before June 30, 2010. (Def. St. ¶¶ 5, 7; Pl. Resp. ¶¶ 5, 7.) If not, the FFA would expire on December 31, 2010. (Def. St. ¶ 7; Pl. Resp. ¶ 7.) China Falcon claims it was not aware of the condition governing termination at the time of the amendment's signing. (Pl. St. ¶ 1.)

The parties amended the FFA a second time on January 26, 2011. (Def. St. ¶ 9; Pl. Resp. ¶ 9.) This Second Amendment to the FFA dropped DeerJet as one of the two specified purchasers, leaving only Minsheng Bank. (Def. St. ¶ 10; Pl. Resp. ¶ 10.) Dassault Jet points to the language of the Second Amendment, which replaced the 2.5% commission with a flat fee of $732,500 for the sale of s/n[3] 101 and a 2.5% commission on the sale of s/n 133. (Def. St. ¶ 11; *see also* Tor. Decl., Ex. 5, § II.) As to aircraft other than s/n 101 and s/n 133, the Second Amendment left the prior terms and conditions unchanged, and specifically provided that the agreement would stay in force

---

[3]     The term "s/n" denotes the last few digits of the serial number associated with a specific jet in the Chinese market sold by Dassault Jet. Because this is the designation used for those aircraft in the moving papers, I will do the same.

until December 31, 2011 (as agreed in the First Amendment). (Tor. Decl., Ex. 5, § III.)

Ms. Cheung claims that she did not read this Second Amendment but admits she "voluntarily" signed it after Dassault had signed it. (Def. St. ¶ 13; Pl. Resp. ¶ 13.) Ms. Cheung also asserts that she was not able to read English at the time and that the Second Amendment as orally described to her was different from the agreement as written. (Pl. Resp. ¶ 13.) "It's only a standard agreement," she testified, "and it's such a big company. I have a trust in the company." (*Id.*) China Falcon alleges that "at all relevant times" and "[a]ccording to the parties' course of dealing" China Falcon would continue to earn a 2.5% commission for all sales to Minsheng and "each of its 'special purpose venture' subsidiaries." (Pl. Resp. ¶ 11; *see also* Pl. St. ¶ 2.)

Concurrently, on September 2, 2009, China Falcon and Dassault Jet entered into a Sales Representation Agreement ("SRA"), with an expiration date of December 31, 2010. Under the SRA, China Falcon would earn a 2% commission upon the sale of any aircraft model from a specified list of models to private companies in the People's Republic of China (other than Minsheng Bank or DeerJet, which were covered by the FFA). (Def. St. ¶¶ 18–20; Pl. Resp. ¶¶ 18–20.) To qualify for this commission, the sale had to result "predominantly and primarily" from China Falcon's services. (Def. St. ¶ 21; Pl. Resp. ¶ 21.) The parties subsequently amended the SRA four separate times, with the fourth amendment extending the SRA until December 31, 2013. (Def. St. ¶ 23; Pl. Resp. ¶ 23.)

The issues in this lawsuit involve the commissions for the sale of four aircraft. Those aircraft are designated s/n 721; s/n 212; s/n 244; and s/n 141. China Falcon claims that, regardless of the "technical" language of the agreements, the parties conducted themselves at all relevant times with the understanding that China Falcon would earn a 2.5% commission on sales to Minsheng and Deerjet, while earning a 2% commission on all other sales. (Pl. St. ¶ 8.) China Falcon claims moreover that this "understanding" between the

parties survived the expiration of the relevant written agreements and is documented by email communications between them. (*See* Pl. St. ¶¶ 11–13.)

I review the facts as to each of the four aircraft sales at issue.

### a. s/n 721

On June 26, 2013, De Hong Capital Co. Ltd. signed a contract with Dassault Jet to purchase s/n 721 for $27 million. (Def. St. ¶ 24; Pl. Resp. ¶ 24.) S/n 721 is a model 7200s airplane manufactured by Dassault Jet. (Def. St. ¶ 25; Pl. Resp. ¶ 25.) This model was not listed in the SRA. (*See* Tor. Decl., ex. 2 at 2 ("[Dassault Jet] is engaged in marketing and selling new Falcon 7X, Falcon 900 LX/DX, and Falcon 2000DX/LX.").) Dassault Jet contends that this sale does not fall within the SRA, and that China Falcon, by signing a separate agreement specific to the sale of s/n 721, agreed to a flat $200,000 commission for this sale. (Def. St. ¶ 26; Tor. Decl., Ex. 9, at 3.) China Falcon instead claims that the parties contemplated that this sale would fall within the SRA, entitling it to a larger, 2% commission. (Pl. Resp. ¶ 26.) China Falcon calculates that 2% commission to be at least a $540,260. (AC ¶ 35.)

At the time, the parties apparently disputed China Falcon's entitlement to a finder's fee. China Falcon claims that it pursued "this customer" for three years in an attempt to close the sale and invested more than $200,000 in its efforts to do so. (Pl. St. ¶ 35.) Dassault Jet counters that the transaction-specific contract governing s/n 721 settled any dispute and that they paid China Falcon $200,000 according to that agreement. (Def. Br. at 2.)

### b. s/n 212

On September 13, 2011, Minsheng Guilong (Tianjin) Aviation Leasing ["Minsheng Tianjin"], a subsidiary of Minsheng, signed a purchase agreement for s/n 163. (Def. St. ¶ 35; Pl. Resp. ¶ 35; Pl. St. ¶ 48; Def. Resp. ¶ 48.) However, Minsheng Tianjin failed to take delivery of s/n 163. (Def. St. ¶ 36; Pl. Resp. ¶ 36.)

On September 3, 2013, Minsheng Jiayi Leasing (Fenglong) ["Minsheng Jiayi"], another Minsheng subsidiary, signed an agreement with Dassault Jet to

purchase a second aircraft, s/n 212, for $49.65 million. (Def. St. ¶ 38; Pl. Resp. ¶ 38; Pl. St. ¶ 50; Def. Resp. ¶ 50.) China Falcon and Dassault Jet entered into an agreement [the "s/n 212 Agreement"] on April 24, 2014, which specified that China Falcon would receive a $150,000 fee for this sale of s/n 212. (Def. St. ¶ 40; Pl. Resp. ¶ 40; Tor. Decl., ex. 12, § III.) At the time of the signing of the s/n 212 Agreement, Ms. Cheung believed the fee offered by Dassault Jet was unfair. (Def. St. ¶ 44; Pl. Resp. ¶ 44.) She claims that she signed the agreement to receive $150,000 only because she believed that China Falcon would otherwise get nothing at all. (Pl. St. ¶ 93.)

China Falcon contends that, for this s/n 212 sale, it was entitled to a 2.5% commission under the FFA. (Pl. Resp. ¶ 40.) The sale price, it says, was approximately $49.5 million, and its 2.5% commission should have amounted to approximately $1,203,650. (AC ¶ 45.) China Falcon's reasoning is somewhat complex. It characterizes the sale of s/n 212 as not a simple sale, but a "swap" (i.e., a substitute purchase of some kind) involving s/n 163, s/n 210, and then s/n 212.

The s/n 212 sale, says China Falcon, should receive the benefit of the terms that would have governed the s/n 163 sale if it had closed. The original (abortive) purchase of s/n 163, says China Falcon, fell within the window of the Second Amendment to the FFA, because the purchase agreement for s/n 163 was executed on September 13, 2011, before the expiration of the Second Amendment on December 31, 2011. (Pl. St. ¶¶ 49, 53; Klein Decl., ex. 32, at 9; *see also* Pl. St. ¶ 55 (claiming that Dassault Jet admitted to the transaction being a "swap").) Dassault Jet points to evidence that the terms for the sale of s/n 163 were materially different than those for s/n 212, so that the two cannot be regarded as part of a single, continuous "swap" transaction. (Def. Resp. ¶ 49.)

Alternatively, China Falcon claims that the parties' agreement or course of dealing, "as borne out by contemporaneous communications," was that the 2.5% rate would apply to all planes sold to Minsheng, during and even after the expiration of the Second Amendment. (Pl. St. ¶ 54.)

6

Finally, China Falcon characterizes this "swap" as part of a bad faith strategy to prevent it from receiving a commission on the sale of s/n 163. (Pl. St. ¶ 69.) Here, China Falcon points to an agreement between Minsheng and Dassault Falcon, entitled the "Business Assistance Agreements" ("BAAs"). It claims that, under the BAAs, funds that should have been disbursed to China Falcon as commissions were instead given to Minsheng to promote, distribute, and market Falcon aircraft in China. (Pl. Resp. ¶ 96.)  That arrangement allegedly gave Minsheng an incentive to terminate its purchase agreement, with the knowledge that it could receive "a bigger back end" if it did not take delivery of the aircraft. (Pl. St. ¶ 77.) Dassault Jet admits only that it had "business assistance agreements" with Minsheng for the promotion of its aircraft. Dassault Jet claims that it handed copies of these agreements to China Falcon during the negotiations, which Ms. Cheung denies. (Def. St. ¶¶ 96–98; Pl. Resp. ¶¶ 96–98.)

As with the sale of s/n 721, Dassault Jet argues that, though the parties initially disputed the finder's fee owed on the aircraft, they nevertheless executed a transaction-specific contract governing China Falcon's finder's fee for s/n 212 and that they paid China Falcon according to that agreement. (Def. Br. at 2.)

### c.  s/n 244

On September 15, 2011, Minsheng Bolong (Tianjin) Aviation Leasing Co. Ltd. ["Minsheng Bolong"] signed a purchase agreement to purchase s/n 157 for $52.1 million. (Def. St. ¶ 47; Pl. Resp. ¶ 47.) Though the purchase agreement contemplated an April 30, 2012 delivery date for the aircraft (Def. St. ¶ 48; Pl. Resp. ¶ 48), Minsheng Bolong refused to take delivery of the aircraft on that day, saying that it had been unable to arrange a resale or lease of the aircraft. (Def. St. ¶ 49; Pl. Resp. ¶ 49.) In response, Dassault Jet adjusted its production schedule to give Minsheng greater flexibility to market the aircraft to its prospective client base. (Def. St. ¶ 50; Pl. Resp. ¶ 50.) As of October 13, 2013, Minsheng Bolong was still refusing to accept delivery. (Def. St. ¶ 51; Pl. Resp. ¶

51.) These delays caused Dassault Jet to incur expenses for maintenance, storage, and labor. (Def. St. ¶ 52; Pl. Resp. ¶ 52.) Dassault Jet finally sold s/n 157 to another buyer. (Def. St. ¶ 53; Pl. Resp. ¶ 53.)

On December 24, 2013, another Minsheng entity, Minsheng Fenglong Aviation Leasing Co. Ltd. ["Minsheng Fenglong"], which had been assigned the purchase rights previously held by Minsheng Bolong, entered into a purchase agreement with Dassault Jet to purchase not s/n 157 but another jet, s/n 244. (Def. St. ¶¶ 54–55; Pl. Resp. ¶¶ 54–55.) That purchase agreement specified a price of $47.95 million for the aircraft. (Def. St. ¶ 58; Pl. Resp. ¶ 58.) However, Minsheng Fenglong refused to accept delivery. (Def. St. ¶ 59; Pl. Resp. ¶ 59.) Dassault Jet, wary of repeating the situation with s/n 157, offered Minsheng Fenglong financing on the sale and a discount of $500,000 if delivery occurred within 45 days. Minsheng Fenglong accepted that offer. (Def. St. ¶ 60; Pl. Resp. ¶ 60.) On November 26, 2014, Dassault Jet and Minsheng Fenglong entered into an agreement including 0.75% per annum financing, a delivery date of December 14, 2015, and an additional purchase "incentive" (i.e., discount) of $500,000 for prompt delivery. (Def. St. ¶ 62–64; Pl. Resp. ¶ 62–64.) The price of the aircraft was $47.95 million without the $500,000 purchase incentive. (Def. St. ¶ 65; Pl. Resp. ¶ 65.) Dassault Jet states that China Falcon had "no personal knowledge" of the events and negotiations between Dassault Jet and Minsheng Fenglong that resulted in this sale. (Def. St. ¶ 66) China Falcon states that Ms. Cheung was involved in "many meetings" regarding both sales (s/n 157 and s/n 244). (Pl. Resp. ¶ 66.)

China Falcon believes it was entitled to a 2.5% commission, amounting to at least a $1,186,250, for the sale of s/n 244. (AC ¶ 54; Pl. St. ¶ 112.) It characterizes the sale of s/n 157 to a different buyer and the sale of s/n 244 to Minsheng Fenglong as a swap" and claims that Ms. Cheung was involved in many meetings regarding the sale of both aircraft. (Pl. St. ¶¶ 100, 107, 113.)

Dassault Jet counters that this was no continuous "swap." After years of negotiation and a failed delivery, it simply sold s/n 157 to another, separate entity and, in a separate transaction, sold s/n 244 to a different Minsheng

subsidiary. (Def. Resp. ¶ 107.) It states that at the time of the sale of s/n 244
there existed no contract under which China Falcon could earn a finder's fee.

### d. s/n 141

In October 2012, Ms. Cheung informed Dassault Jet that she had
identified a potential purchaser of s/n 141, Mr. Li Guangyu, who offered a
"very low" price of $46 million. (Def. St. ¶¶ 69–70; Pl. Resp. ¶¶ 69–70.) She
communicated to Mr. Li Dassault Jet's counteroffer of $52 million, with an
eight-week delivery schedule and $1 million commission to China Falcon. (Def.
St. ¶ 71–72; Pl. Resp. ¶ 71–72.) Dassault Jet warned Ms. Cheung, though, that
"if further negotiations are needed, it will be deducted from your success fees."
(Def. St. ¶ 73; Pl. Resp. ¶ 73.) Mr. Li rejected the counteroffer. (Def. St. ¶ 74; Pl.
Resp. ¶ 74.) On December 18, 2012, Dassault Jet revised its offer to $49.5
million with a $1 million credit toward the Falcon Care aircraft maintenance
program, but with no commission to China Falcon. (Def. St. ¶¶ 75–76; Pl. Resp.
¶¶ 75–76.) Upon reviewing this offer, Ms. Cheung requested that China Falcon
receive a $500,000 commission in the event of a sale, a proposal which
Dassault Jet rejected. (Def. St. ¶¶ 77–78; Pl. Resp. ¶¶ 77–78.) In an email, Ms.
Cheung noted that in the past she had "compromise[d]" her commission in
order to close a sale, and she informed Dassault Jet that "[i]f we can fulfill the
price the customer wants of 47 million, then I don't need commission." "If we
do so," she wrote, "at least the customer will be very happy, and he will
introduce other customers to me." (Def. St. ¶¶ 79–80; Pl. Resp. ¶¶ 79–80.) The
sale, however, did not go through on those terms.

On December 20, 2012, Dassault Jet offered Mr. Li not s/n 141 for $47
million, but a different model jet for $48.2 million, with a commission to China
Falcon of $200,000. (Def. St. ¶¶ 81–82; Def. Resp. ¶¶ 81–82.) Dassault Jet
states that Ms. Cheung informed them that this commission was acceptable to
her (Def. St. ¶ 83), at least if the plane sold for that specific price. (Def. St. ¶
84; Pl. Resp. ¶ 84.) However, Mr. Li rejected this offer because the delivery date
was unacceptable. (Def. St. ¶ 85; Pl. Resp. ¶ 85.)

On December 31, 2012, the negotiations returned to the subject of s/n
141. Mr. Li offered a price of $48 million for s/n 141. (Def. St. ¶ 89; Pl. Resp. ¶
89.) Dassault Jet informed Ms. Cheung of the offer and told her that she would
not receive a commission if the sale occurred at that price. (Def. St. ¶ 90; Pl.
Resp. ¶ 90.) The sale for s/n 141 eventually went through with a purchase
price of $49.5 million which included $1 million worth of Falcon Care
maintenance. (Def. St. ¶¶ 92–93; Pl. Resp. ¶¶ 92–93.) Mr. Li's company paid for
the aircraft and accepted delivery on May 16, 2013. (Def. St. ¶ 94; Pl. Resp. ¶
94.)

On April 11, 2013, Dassault Jet responded to an email that Ms. Cheung
had sent during negotiations for the purchase of s/n 141 by Mr. Li. A Dassault
Jet representative wrote that "I confirm that [Dassault Jet] will stay in phase
with your agreement of not receiving any finder['s] fee" and that "[China Falcon]
agreed [to the sale of s/n 141] at a very low price and accepted not [to] take any
finder['s] fee." (Pl St. ¶ 35; Def. Resp. ¶ 35.) China Falcon says that it never
agreed to forgo a commission on a sale at a price of $49 million. (Pl St. ¶ 36.) It
also claims that Dassault Jet repeatedly tried to cut it out of the negotiation
process to force it into a reduced commission or no commission at all. (Pl. St. ¶
41.)

The parties agree that the then-operative Fourth Amendment to the SRA,
executed on January 24, 2013, shortly before the execution of the purchase
agreement for s/n 141, did not contain a specific reference to the commission
for s/n 141. (Pl. St. ¶¶ 44–45; Def. Resp. ¶¶ 44–45.) China Falcon claims that it
was practice between the parties not to identify not to identify each and every
plane, but only those that deviated from the "standard" commission rate that
would govern that sale. (Pl. St. ¶ 46.) In support it cites the Third Amendment
to the SRA which made such a provision for a particular plane. (*Id.*)

China Falcon states that, under the Fourth Amendment of the SRA, it was entitled to a 2% commission on the $49 million sale price of s/n 141, amounting to at least $1,393,910. (AC ¶ 60; Pl. St. ¶ 17; Pl. St. ¶ 47)[4]

### e. English Capability of Ms. Cheung

There is also a dispute in the record as to Ms. Cheung's ability to speak, read, and write the English language. Dassault Jet claims that Ms. Cheung "understood" English during the negotiations, though she used a number of assistants, including her then-boyfriend, to help communicate with Dassault Jet and to translate documents. (Def. St. ¶ 95.) Ms. Cheung, however, denies that she understood English at the time, claiming that her English skills were "limited." (Pl. Resp. ¶ 95.)

## II.   Legal Argument

### a. Standard of Review

Federal Rule of Civil Procedure 56(a) provides that summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Kreschollek v. S. Stevedoring Co.*, 223 F.3d 202, 204 (3d Cir. 2000). In deciding a motion for summary judgment, a court must construe all facts and inferences in the light most favorable to the nonmoving party. *See Boyle v. Cty. of Allegheny, Pa.*, 139 F.3d 386, 393 (3d Cir. 1998). The moving party bears the burden of establishing that genuine issue of material fact remains. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). "[W]ith respect to an issue on which the nonmoving party bears the burden of proof . . . the burden on the moving party may be discharged by 'showing'—that is, pointing out to the

---

[4]      Dassault Jet also argues that contemporaneous emails between its employees and China Falcon during the sale show that China Falcon agreed to take no commission on the sale of s/n 141. (Def. Br. at 3 n.4.) However, Ms. Cheung denied that this happened at her deposition. (*Id.*) Dassault Jet, stating that this argument may implicate a question of fact, decided not to move for summary judgment on these grounds but reserved this argument. (*Id.*)

district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325.

Once the moving party has met that threshold burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to material facts." *Matsuhita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The opposing party must present actual evidence that creates a genuine issue as to a material fact for trial. *Anderson*, 477 U.S. at 248; *see also* Fed. R. Civ. P. 56(c) (setting forth types of evidence on which a nonmoving party must rely to support its assertion that genuine issues of material fact exist). "[U]nsupported allegations . . . and pleadings are insufficient to repel summary judgment." *Schoch v. First Fid. Bancorp.*, 912 F.2d 654, 657 (3d Cir. 1990); *see also Gleason v. Norwest Mortg., Inc.*, 243 F.3d 130, 138 (3d Cir. 2001) ("A nonmoving party has created a genuine issue of material fact if it has provided sufficient evidence to allow a jury to find in its favor at trial."). If the nonmoving party has failed "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial, . . . there can be no 'genuine issue of material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Katz v. Aetna Cas. & Sur. Co.*, 972 F.2d 53, 55 (3d Cir. 1992) (quoting *Celotex*, 477 U.S. at 322–23).

In deciding a motion for summary judgment, the court's role is not to evaluate the evidence and decide the truth of the matter, but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. Credibility determinations are the province of the fact finder. *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992). The summary judgment standard, however, does not operate in a vacuum. "[I]n ruling on a motion for summary judgment, the judge must view the evidence presented through the prism of the substantive evidentiary burden." *Anderson*, 477 U.S. at 242.

### b. Breach of Contract

Under New Jersey law, a plaintiff must establish the following elements to state a claim for breach of contract: "(1) the existence of a valid contract between the parties; (2) failure of the defendant to perform its obligations under the contract; and (3) a causal relationship between the breach and the plaintiff's alleged damages." *Sheet Metal Workers Int'l Ass'n Local Union No. 27, AFL-CIO v. E.P. Donnelly, Inc.*, 737 F.3d 879, 900 (3d Cir. 2013). The Supreme Court of New Jersey has instructed that "[w]here the terms of a contract are clear and unambiguous there is no room for interpretation or construction" and it must be enforced "as written." *Id.* (quoting *Kutzin v. Pirnie*, 124 N.J. 500, 507 (1991)).

### i. s/n 721

Dassault Jet argues that the SRA does not apply to the sale of s/n 721, a Falcon F2000s model aircraft. The SRA explicitly covers the Dassault 2000 series. None of the amendments to the SRA, however, expanded the SRA's scope to the 2000s series. Rather, says Dassault Jet, a separate agreement entered into on December 3, 2013 ("s/n 721 Finder's Fee Agreement") governs the sale of s/n 721. (Def. St. ¶¶ 26–29; Tor. Decl., ex. 9.) That separate agreement sets out a flat fee of $200,000 for the s/n 721 sale. Dassault Jet also argues that this separate agreement operates as an "accord and satisfaction," whereby a superseding "agreement . . . upon its execution, completely terminates a party's existing rights and constitutes a defense to any action to enforce pre-existing claims." (*Id.* at 15 (quoting *Nevets CM Inc. v. Nissho Iwai American Corp.*, 726 F. Supp. 525 (D.N.J. 1989)).) Even assuming that China Falcon had a preexisting right to a percentage commission, then, the separate, specific s/n 721 Finder's Fee Agreement extinguished and superseded that right.

China Falcon, on the other hand, argues that the parties had a "course of dealing" under which s/n 721 would fall into the "ambit" of the SRA. (Pl. Opp. at 34.) China Falcon acknowledges that the F2000s series did not exist

13

when the SFA was executed, but states that the 2000s series is simply a continuation or update of the 2000 series, and should be deemed to be covered by the SRA. (*Id.* at 33–34.) China Falcon also attacks the separate s/n 721 Finder's Fee Agreement, stating it was not supported by consideration or was the product of duress. (*Id.* at 34.)

There is no question that the parties executed the SRA which, by its explicit terms, does not apply to a F2000s series jet like s/n 721. (Def. St. ¶ 18; Pl. Resp. ¶ 18; Tor. Decl., ex. 9 at 2.) There is also no question that the s/n 721 Finder's Fee Agreement was duly executed. Ms. Cheung initialed each page and physically signed that agreement, which expressly stated that the finder's fee for the sale of s/n 721 would be $200,000 if Dassault Jet sold it to De Hong Capital. (Def. St. ¶¶ 33–34; Pl. Resp. ¶¶ 33–34; Tor. Decl., ex. 9 at 1–2.) The only evidence China Falcon cites to show that the parties had an understanding different from that established in the SRA and the separate agreement are copies of the SRA and its amendments and statements made by Ms. Cheung at her deposition. (*See* Pl. Opp. at 34.) However, the plain language of the SRA and its amendments do not contemplate a commission for the sale of a model F2000s nor do their terms speak to what should happen to the sale of a later model. (Tor. Decl., ex. 9 at 2.) Likewise, Ms. Cheung's statement that "At that time I say that I had been with this client for three years, I have been following up on this client for three years. It's quite a difficult job for me to be able to bring this client along and the investment . . . I put in more than $200,000" does not reasonably support the conclusion that there was a mutual understanding between China Falcon and Dassault Jet that the agreement would cover that sale. (Klein Decl., ex. 19, tr. 280:7–13.) If anything, the very existence of the separate s/n 721 Purchase Agreement is strong evidence that everyone understood that the sale fell outside the bounds of the SRA. And the parties' regular practice of explicitly amending their agreements further argues against finding an amendment-by-implication.

In short, China Falcon does not put forward evidence sufficient to raise a genuine dispute of material fact as to its contention that the SRA was

ambiguous or that the parties intended for newer models to be covered by the SRA. [5]

I must also reject the argument that the s/n 721 Finder's Fee Agreement was not supported by consideration.

> Consideration is, in effect, the price bargained for and paid for a promise. A very slight advantage to one party, or a trifling inconvenience to the other, is a sufficient consideration to support a contract when made by a person of good capacity, who is not at the time under the influence of any fraud, imposition, or mistake. Whatever consideration a promisor assents to as the price of its promise is legally sufficient consideration. *Coast Nat'l Bank v. Bloom*, 113 N.J.L. 597 (E. & A. 1943).

*Oscar v. Simeonidis*, 325 N.J. Super. 476, 485 (App. Div. 2002). As established above, China Falcon had no rights under the SRA to receive a commission for the sale of an F2000s model aircraft. The best that can be said is that, at the time, its rights were disputed or indeterminate. It entered into a separate written Finder's Fee Agreement to contribute its "efforts" to help Dassault Jet "successfully negotiate" the sale (*id.* at 1), in return for a negotiated commission of $200,000. Whether this is viewed as a compromise of a dispute over the old SRA agreement, or as a wholly new agreement, there was consideration.

Likewise, China Falcon has failed to demonstrate that it should be excused from the separate 721 Purchase Agreement because it signed that agreement under economic duress. Under New Jersey law, "the party alleging economic duress must show that [it] has been the victim of a wrongful or unlawful act or threat, and [s]uch act or threat must be one which deprives the victim of [its] unfettered will." *Cont'l Bank of Pa. v. Barclay Riding Acad., Inc.*, 93 N.J. 153, 176 (1983) (noting that there has been disagreement among the

---

[5]   China Falcon falls back on an argument that it should have been notified that newer models would not be covered. (Pl. Opp. at 33–34.) That alleged duty to notify, however, is not contained in any of the agreements between China Falcon and Dassault Jet; nor is there such an implied duty at law. As to the terms of a written agreement, the agreement itself is the only "notification" required.

courts about the degree of coercion necessary for a finding of economic duress).
The "decisive factor" in the economic duress analysis is the wrongfulness of the
pressure exerted. *Id.* at 177. China Falcon, despite its statement that "[t]his is
a clear case of economic duress" (Pl. Opp. at 35), has not put forward sufficient
evidence (or any evidence, really) to show that Dassault Jet behaved in a way
that deprived China Falcon of its "unfettered will." It has made no allegations of
threats or other wrongful conduct that would constitute duress; it alleges only
that Dassault Jet threatened it would not pay them the commission to which
China Falcon believed itself entitled under the SRA. That claim of entitlement
was dubious at the time and, as I have ruled, actually invalid. These are not
grounds for invalidating an otherwise valid separate agreement under the
doctrine of economic duress.

The commission owed was $200,000, and that commission was paid.
Because the SRA and its amendments do not govern the sale of s/n 721,
because a valid, separate s/n 721 Purchase Agreement, supported by
consideration and not the product of duress, does govern that sale, I will grant
summary judgment in favor of Dassault Jet on China Falcon's breach of
contract claim in connection with the sale of s/n 721.

### ii.  s/n 212

The parties disagree as to what agreement governs the sale of s/n 212.
As in the case of s/n 721, Dassault Jet argues that China Falcon signed a
separate agreement ("s/n 212 Finder's Fee Agreement") governing this sale,
whereby Dassault Jet would pay China Falcon a flat fee of $150,000. (Def. Br.
at 18; Tor. Decl., ex. 12.) China Falcon claims that the FFA governs the s/n
212 sale and entitles it to a 2.5% commission. Ms. Cheung, it says, was
"pressured" into signing the s/n 212 Finder's Fee Agreement, which therefore
is not valid. (Pl. Opp. at 26, 30.) It also characterizes the sale of s/n 212 as a
"swap" for the abortive s/n 163 transaction. (*Id.* at 26.) Under this theory,
China Falcon earned its commission for the s/n 212 sale when the customer
signed the purchase agreement for s/n 163 in September 2011, before the FFA

16

expired. (*Id.*) Alternatively, it earned its commission in September 2013, when the purchase agreement for s/n 212 was signed, because, despite the expiration of the Second Amendment to the FFA, the parties continued to "act" with the understanding that China Falcon would be entitled to a 2.5% commission on all sales to Minsheng "for years beyond [the FFA's] technical expiration date." (*Id.* at 27.)

The "swap" theory—that, under the FFA, China Falcon was entitled to a 2.5% commission for the sale of s/n 163, and that this entitlement carried over to the later sale of s/n 212—fails in its premise. Even under the explicit language of the FFA, China Falcon would *not* have been entitled to a 2.5% commission on the sale of s/n 163. The FFA conditioned the eligibility of China Falcon to receive a commission on two sets of events:

> (a) the buyer had to "enter into and sign a binding and enforceable contract of sale with [Dassault Jet] for the purchase of one or more new Falcon aircraft on or before December 31, 2009"; and

> (b) "the buyer who enters into the contract of sale must [1] complete the acquisition, [2] fully pay for and [3] take title to the aircraft in accordance with the terms of the contract."

(Def. St. ¶ 4; Pl. Resp. ¶ 4 ([bracketed] numbers added.)

China Falcon contends that only (a), the signing of a purchase agreement, was necessary. The contract is clear, however, that (b), comprising acquisition, payment, and conveyance of title, must also occur in order for a sale to be "complete." That conclusion flows from the plain language of the contract.[6] *See generally Schor v. FMS Financial Corp.*, 357 N.J. Super. 185, 191

---

[6]    China Falcon tries to argue that the (b) requirements should not apply because it could not control the actions of the purchaser vis-à-vis acceptance of delivery, payment, and taking title. That was, however, the condition for which it bargained. Conditions precedent need not be within a party's control to be enforceable. If the condition is stated clearly, I may contract, for example, to drive you to the beach if it does not rain. *See Torre v. Geary*, No. C-233-14, 2017 WL 1101488, at *6 (N.J. Super. Ct. App. Div. Mar. 24, 2017) (noting that, while conditions precedent are generally disfavored, they are permitted when they are expressed in clear language). China Falcon also contends, however, that Dassault Jet actively strove in bad faith to prevent

(App. Div. 2002) ("To determine the meaning of the terms of an agreement by the objective manifestations of the parties' intent, the terms of the contract must be given their plain and ordinary meaning. The court should examine the document as a whole and the court should not torture the language of a contract to create ambiguity. . . . A party that uses unambiguous terms in a contract cannot be relieved from the language simply because it had a secret, unexpressed intent that the language should have an interpretation contrary to the words' plain meaning." (citations and quotation marks omitted).).

It is undisputed that Minsheng never accepted the delivery of s/n 163. (Def. St. ¶ 36; Pl. St. ¶ 38.) Under the explicit terms of the FFA, then, China Falcon was not entitled to a commission for that earlier sale. It is therefore not necessary to consider the remainder of the "swap" theory, *i.e.*, that the commission on s/n 163 should carry forward to the s/n 212 transaction. Under the explicit terms of the contract, however, that argument is dubious.

China Falcon's second theory—that the FFA remained in effect at the time of the sale of s/n 212 and entitled it to a commission—also runs afoul of the plain language of the agreement. The FFA, by its terms, expired at the latest on December 31, 2011, well before the sale of s/n 212 took place in 2013. (Tor. Decl., ex. 3, § I.1; *see also* Pl. Opp. at 5 ("[T]he FFA technically expired on December 31, 2011.").)

China Falcon calls this a "technical expiration" (Pl. Opp. at 1), but adding the word "technical" does not make the contractual language disappear. The expiration date is an explicit, unambiguous, and enforceable term of the FFA.

China Falcon argues in the alternative that the parties had a "course of dealing" that in effect extended the term of the FFA past the expiration date for purposes of the s/n 212 sale. This contention fails for lack of evidence. China Falcon's most salient proof consists of an internal email obtained from

---

the fulfillment of these conditions precedent by offering Minsheng financial incentives. That distinct argument is best considered within the framework of breach of the implied covenant of good faith and fair dealing. *See infra.*

Dassault Jet. (Klein Decl., ex. 4.) That email, dated February 28, 2013, related to another, earlier sale of a different jet (s/n 159) to a different company. (*Id.*) The email concerns the approval of a payment to China Falcon and it merely states that "2.5% is the normal commission for sales to both Minsheng Leasing and the Hainan Group." (*Id.*) No fact-finder would find that this exchange raises an ambiguity as to whether the FFA was supposed to operate past its expiration date as to s/n 212.

As in the case of s/n 721, *see* Section IV.i, *supra*, China Falcon has failed to establish that the s/n 212 Finder's Fee Agreement was the product of economic duress. It has not asserted threats or wrongful conduct regarding this sale that would rise to the required level. Nor has it shown that Dassault Jet's actions prevented China Falcon from asserting its "unfettered will" during the negotiations for the commission of the sale of s/n 212. As in the case of s/n 721, *see supra,* the parties do not dispute that the s/n 212 Finder's Fee Agreement was duly executed. (Def. St. ¶ 39; Pl. Resp. ¶ 38.) It therefore governs the finder's fee for the s/n 212 sale.

Under the s/n 212 Finder's Fee Agreement, China Falcon was entitled to a flat fee of $150,000, which was paid. Because China Falcon has failed to put forward sufficient evidence that Dassault Jet breached the terms of the expired FFA or that the separate s/n 212 Finder's Fee Agreement was signed under economic duress, I will grant summary judgement in favor of Dassault Jet for the breach of contract claim concerning the sale of s/n 212.

### iii.  s/n 244

As to s/n 244, China Falcon relies on similar arguments to the ones made for s/n 212. The s/n 244 sale, it says, was a "swap" for the earlier s/n 157 sale. (Pl. Opp. at 32.) And although the FFA had expired by the time of the sale of s/n 244, China Falcon argues that the parties continued to act with the understanding that it was entitled to a 2.5% on all sales to Minsheng. (*Id.* at 32–33.)

By its terms, the FFA agreement had expired by the time of the s/n 244 sale. Citing the same email evidence it cited in relation to s/n 212, China Falcon again fails to raise a genuine dispute as to the whether the parties had an understanding that the FFA agreement would continue to apply to sales made after its expiration. (*Compare* Pl. Opp. at 28–29, *with id.* at 32–33.) Thus, I will grant summary judgment in favor of Dassault Jet as to the claim of breach of contract regarding the sale of s/n 244.

### iv.  s/n 141

As to s/n 141 only, Dassault Jet asserts the distinct defense of equitable estoppel. It points to evidence that it told China Falcon it had made a final offer to Mr. Li for $48 million, and that if the sale closed China Falcon would not receive a commission. China Falcon allegedly remained silent about the commission and told Mr. Li to proceed with the transaction. (Def. Br. at 24.) That silence and conduct, says Dassault Jet, equitably estops China Falcon from collecting a commission on that sale. (*Id.* at 22.)

 "Equitable estoppel 'is invoked in the interests of justice, morality and common fairness.'" *Newark Cab Ass'n v. City of Newark*, 235 F. Supp.3d 638, 648 (D.N.J. 2017) (quoting *Knorr v. Smeal*, 178 N.J. 169, 178 (2003)). "To establish equitable estoppel, plaintiffs must show that defendant engaged in conduct, either intentionally or under circumstances that induced reliance, and that plaintiffs acted or changed their position to their detriment." *Id.* (quoting *Knorr,* 178 N.J. at 178).

Dassault Jet's reliance on Ms. Cheung's purported silence during the negotiations is misplaced. They characterize China Falcon as having a "duty" during the negotiations to intervene and clarify whether it would take a commission. (*See* Def. Reply at 7 (citing *Davin, LLC v. Daham*, 329 N.J. Super. 54, 68–69 (App. Div. 2000) ("Equitable estoppel may arise by silence or omission where one is under a duty to speak or act.")).) Dassault Jet has not provided evidence that Ms. Cheung was under any such duty. The cases cited by Dassault Jet are inapt, as they dealt with situations where the reliance had

much more substantial and unexpected consequences and went against the basic expectations of the parties. *Davin*, 329 N.J. Super. at 68–69 (finding equitable estoppel *could* apply to an eviction where the landlord knew defendants were incurring substantial expenditures to open their bagel shop but also knew about knew of an active foreclosure attempt on the property, thus creating a duty to advise defendants of their "perilous position"); *Iacono v. Toll Bros.*, 225 N.J. Super. 87, 92 (App. Div. 1988) (finding silence by one of the parties in a specific performance action as grounds for equitable estoppel where that party's conduct and silence were consistent with the terms in the binding contract, which induced plaintiffs' reliance in staying out of a sharply rising real estate market).

Here, China Falcon and Dassault Jet had a binding contract (i.e., the SRA) which governed the relationship of the parties. China Falcon had "spoken" in the context of arriving at the terms of the contract. The two companies had been in a longstanding contractual relationship under which China Jet received commissions. Dassault Jet was thus not unfairly surprised by China Jet's failure to speak up and demand a commission to which it already believed itself entitled under the SRA. And Dassault Jet could have clarified the situation; as it had done in other transactions, it could have proposed a deal-specific agreement that would override the SRA and govern the sale of s/n 141. In short, Dassault Jet has not shown that it had a reasonable basis to enter into the transaction with no expectation of owing a commission merely because China Jet was silent.[7]

Dassault Jet does not rely solely on silence, however. It also asserts that China Jet was equitably estopped by oral statements of Ms. Cheung in which she expressed willingness to receive no commission if the sale price for s/n 141

---

[7]    Dassault Jet here complains that China Falcon "silently watched [it] sell s/n 141 to Mr. Li for net $48 million, demanding a commission only after title had passed and the aircraft delivered." Elsewhere, of course, Dassault Jet insists that China Falcon *could not* claim its commission until after those two conditions were met. (*Compare* Def. Reply at 7, *with*, *e.g.*, Def. Br. 17–18.)

was below a certain dollar threshold. Dassault Jet admits, however, that the dispute over whether Ms. Cheung orally agreed to accept no commission "potentially creat[es] an issue of fact for trial." (Def. Br. at 22.)

I will assume *arguendo* that there could be an oral modification, if there was mutual assent, as opposed to unilateral statements in derogation of the existing agreement. *See McGrath v. Poppleton*, 550 F. Supp. 2d 564, 571 (D.N.J. 2008) ("But whether or not the parties intended that all modifications be in writing, at common law, a 'no oral modification' clause may be waived by the parties by entering into an otherwise enforceable oral agreement." (citation omitted)). Nevertheless, there is a dispute between the parties as to whether such an oral modification occurred, whether China Falcon assented to it, and whether that oral modification, even with assent, is enforceable. *See id.*; *Cty. of Morris v. Fauver*, 153 N.J. 80, 100 (1998)).[8]

Because Dassault Jet has not been able to show equitable estoppel applies to the SRA for the sale of s/n 141 and has not been able to show that the parties modified the SRA with respect to that specific sale, I will deny Dassault Jet's motion for summary judgment on the breach of contract claim for the sale of s/n 141.

### c. Breach of Implied Covenant of Good Faith and Fair Dealing

"Every contract in New Jersey contains an implied covenant of good faith and fair dealing." *Gotthelf v. Toyota Motor Sales, U.S.A., Inc.*, 525 Fed. App'x 94, 106 (3d Cir. 2013) (citing *Kalogeras v. 239 Broad Ave., LLC*, 202 N.J. 349, 366 (2010)). A breach of this implied covenant occurs if one of the parties to the contract "acts in bad faith or engages in some other form of inequitable conduct in the performances of a contractual obligation." *Black Horse Lane*

---

[8]   Dassault Jet cites to Ms. Cheung's statement at her deposition that "[i]f a sales price is lower and then you get a lower commission. That's known to the whole world. And everyone knows that and that my practice." (Def. St. ¶ 68.) That statement, however, may stand for nothing more than the mathematical certainty that the absolute dollar amount of a percentage-based commission goes down when the sale price goes down. It is not proof or an admission that China Falcon would lower its *percentage* (let alone lower it to zero) as the price for s/n 141 dropped.

*Assoc., L.P. v. Dow Chem. Corp.*, 228 F.3d 275, 288 (3d Cir. 2000) (citing *Sons of Thunder, Inc. v. Borden, Inc.*, 148 N.J. 396, 423–24 (1997)). Described differently, "good faith" entails adherence to "community standards of decency, fairness[,] or reasonableness" and requires a party to refrain from "destroying or injuring the right of the other party to receive its contractual benefits." *Iliadis v. Wal-Mart Stores, Inc.*, 191 N.J. 88, 109–10 (2007) (citations omitted). "[A] plaintiff must also prove the defendant's bad motive or intention." *Id.* On the other hand, a party does not breach this implied covenant merely by making decisions that disadvantage the other party, nor are the parties required to behave altruistically to each other. *Fabbro v. Drx Urgent Care, LLC*, 616 Fed. App'x 485, 488 (3d Cir. 2015) (quoting *Elliott & Frantz, Inc. v. Ingersoll-Rand Co.*, 457 F.3d 312, 329 (3d Cir. 2006)).[9]

The party alleging a breach of the implied covenant of good faith and fair dealing must provide sufficient evidence to support a conclusion that the party alleged to have acted in bad faith has engaged in some conduct that denied the benefit of the bargain originally intended by the parties. *Gotthelf*, 525 Fed. App'x at 106. This includes actions which have the effect of destroying or injuring the right of the other party to receive the fruits of the contract. *Kalogeras*, 202 N.J. at 366. "It is not enough for [the plaintiff] to merely present evidence that [d]efendants acted in bad faith; those alleged bad-faith actions must also have denied [p]laintiff 'the benefit of the bargain originally intended

---

[9]    The Supreme Court of New Jersey has further elucidated the doctrine thus:

If courts construe the covenant too broadly, it 'could become an all-embracing statement of the parties' obligations under contract law, imposing unintended obligations upon parties and destroying mutual benefits created by legally binding agreements. We have warned that 'an allegation of bad faith or unfair dealing should not be permitted to be advanced in the abstract and absent an improper motive.' 'Contract law does not require parties to behave altruistically toward each other; it does not proceed on the philosophy that I am my brother's keeper. We stress that while a commercial party does not have to act with benevolence towards an opposing party, it cannot behave inequitably.

*Brunswick Hills Racquet Club, Inc. v. Route 18 Shopping Ctr. Assocs.*, 182 N.J. 210, 231 (2005) (citations omitted).

by the parties.'" *Irwin Katz & Assoc., Inc. v. Concepts in Health, Inc.*, No. 13-1217, 2017 WL 593502, at * 23 (D.N.J. Feb. 14, 2017) (quoting *Gotthelf*, 525 F. App'x at 106).

Here are the essentials of China Falcon's argument that Dassault Jet breached the implied covenant of good faith and fair dealing: (1) Dassault Jet entered into a separate agreement with Minsheng; (2) Dassault Jet officers and employees engaged in a scheme to avoid paying full commission or any commissions to China Falcon; (3) Dassault Jet presented documents to Ms. Cheung in English, knowing full well that she could not read or write in English fluently; (4) Dassault Jet switched s/n 163 for s/n 212 in order to avoid paying a full commission to China Falcon; and (5) Dassault Jet switched s/n 157 for s/n 244 and switched subsidiaries of Minsheng as purchaser in order to avoid paying China Falcon a full commission. (AC ¶¶ 66–69.) China Falcon claims that these actions evince bad faith performance on the part of Dassault Jet and argue that summary judgment is thus inappropriate. (Pl. Opp. at 38.)

The question of bad faith is a question of fact, *Cedar Holdings, LLC v. Menashe*, No. 16-7152, 2017 WL 13149321, at *4 (D.N.J. Apr. 7, 2017), and here there is a dispute over that question of fact. As China Falcon interprets the facts, Dassault Jet actively worked with Minsheng to prevent China Falcon from receiving full commissions on the sale of aircraft. China Falcon disputes that it had knowledge of the agreements between Minsheng and Dassault Jet and points to some evidence that it was kept in the dark. (*See* Pl. Resp. ¶ 97 (citing Klein Decl., ex. 16 at Tr. 92:3–11; ex. 6 at Tr. 53:13–18).) These agreements with Minsheng created an incentive for Minsheng to decline delivery of aircraft it would have otherwise purchased (and which would have generated a commission for China Falcon). Dassault Jet, on this view, colluded with Minsheng to circumvent China Falcon and deny it the commissions it was entitled to expect from the contract with Dassault Jet.

Dassault Jet, to be sure, offers an alternative interpretation of the facts: As for s/n 212 and s/n 157, it was Minsheng on its own which failed to take delivery of the aircraft and caused the sale to fall through. At that point, Dassault Jet had no choice but to find another buyer for these aircraft. (Def. Br. at 25–26.)  Regarding s/n 141, Dassault Jet says that it proposed prices to the buyer that would have netted China Falcon a commission, but the buyer rejected them. (*Id.* at 26–27.) Regarding s/n 244, Dassault Jet again blames China Falcon's "own client" for refusing to accept delivery of the aircraft and causing the delays. (*Id.* at 27.)

As to s/n 212 and s/n 244, there is an issue of fact as to whether Dassault Jet entered into a collusive agreement with Minsheng by which the two engineered the failure of the condition precedent (Minsheng's acceptance of delivery) to China Falcon's entitlement to a commission on the earlier transaction, and then entered into their own, similar "swap" transaction, having circumvented China Falcon. Viewing the facts in the light most favorable to China Falcon, I must deny Dassault Jet's motion for summary judgment on the claim of breach of the implied covenant of good faith and fair dealing as to these two transactions.[10]

---

[10]    Dassault Jet also takes issue with China Falcon's assertion of both a breach of contract claim and a good faith and fair dealing claim based on the same facts. (Def. Reply at 9.) Duplicative claims, it says, are not permitted by New Jersey law. (*Id.* (citing *Hahn v. OnBoard LLC*, No. 09-3639, 2009 WL 4508580, at *6 (D.N.J. Nov. 19, 2006) ("In both New York and New Jersey, a plaintiff cannot maintain a claim for breach of the implied covenant of good faith and fair dealing when the conduct at issue is governed by the terms of an express contract or the cause of action arises out of the same conduct underlying the alleged breach of contract.")).) It is true that the implied covenant of good faith and fair dealing cannot override an express term in a contact. *Wade v. Kessler*, 172 N.J. 327, 342 (2002) (noting also that a party's performance under a contract may breach the implied covenant even though that performance does not violate a pertinent express term). The implied covenant claim, however, is not just another name for the breach of contract claim. It does involve a distinct set of facts and considerations, even though it arises from the same general narrative as the breach of contract claim. *See Cedar Holdings, LLC v. Menashe*, No. 16-7152, 2017 WL 13149321, at *3 (D.N.J. Apr. 7, 2017) ("A claim for breach of the implied covenant is duplicative of a breach of contract claim when allegations of bad faith *all* relate to actions that form the basis of the breach of contract claim." (emphasis added)). China Falcon alleges that Dassault Jet engaged in a set of actions

### d. Quantum Meruit

"'Quantum meruit,' which literally means 'as much as is deserved,' is applied when, absent a manifest intention to be bound, 'one party has conferred a benefit on another and the circumstances are such that to deny recovery would be unjust." *Kas Oriental Rugs, Inc. v. Ellman*, 394 N.J. Super 278, 286 (App. Div. 2007) (citations omitted). "Stated another way, the basis for the application of quantum meruit is 'wholly unlike an express or implied-in-fact contract in that it is 'imposed by the law for the purpose of bringing about justice without reference to the intention of the parties.'" *Id.* (quoting *St. Barnabas Med. Ctr. v. Cty. of Essex*, 11 N.J. 67, 79 (1988)). To recover under a theory of quantum meruit, a plaintiff must establish (1) the performance of services in good faith; (2) the acceptance of the services by the entity to which they were rendered; (3) an expectation of compensation therefor; and (4) the reasonable value of the services. *Coldwell Banker Commercial/ Feist & Feist Realty Corp. v. Blancke P.W. L.L.C.*, 368 N.J. Super. 382, 401 (App. Div. 2004) (quoting *Longo v. Shore & Reich, Ltd.*, 25 F.3d 94, 98 (2d Cir. 1994)). However, "[i]t has long been recognized that the existence of an express contract excludes the awarding of the relief regarding the same subject matter based on quantum meruit." *Kas Oriental*, 394 N.J. Super at 286.

China Falcon says that it provided valuable services to Dassault Jet in good faith with a reasonable expectation that it would be compensated for those services. (AC ¶ 71.) It alleges that, as described above, it identified

---

whereby it "repeatedly tried to cut [Ms. Cheung] out and force her into getting less or no commission at all" and that it tried to divert funds destined to China Falcon to Minsheng instead. (Pl. Opp. at 37.) These facts are separate from China Falcon's claims that it was not paid the amount it was owed under the express terms of the SRA and FFA. Additionally, federal practice and substantive New Jersey law allow for the pleading and pursuit of alternative and even inconsistent theories in pursuit of breach of contract and quasi-contractual theories. *See* Fed. R. Civ. P. 8(d); *Kas Oriental Rugs, Inc. v. Ellman*, 394 N.J. Super. 278, 288 (App. Div. 2007). Plaintiffs merely are not permitted to recover on the inconsistent theories. *See, e.g., id.* (reversing the trial court's award of damages on both a breach of contract theory and a quantum meruit theory).

potential customers, introduced those customers to Dassault Jet, arranged meetings, and engaged in negotiations that led to those customers' purchasing Dassault aircraft. (Pl. Opp. at 39.) It further describes these actions as "the typical services of a broker" and argues that the particular expenses incurred by China Falcon are irrelevant to whether China Falcon could reasonably expect compensation in the form of a commission for the provision of these services. (*Id.*)

New Jersey courts have allowed brokers and sales representatives to recover on a theory of quantum meruit when the principal accepts the services of the broker or sales representative but the contract between the two proves unenforceable for lack of agreement on an essential term (e.g., the commission for a sale). *See, e.g., Weichert Co. Realtors v. Ryan*, 128 N.J. 427, 438 (1992). If an express contract exists, however, quantum meruit relief is not available.

In *Kas Oriental*, an importer/seller of rugs engaged an independent sales representative, and the two agreed orally on "[t]erritory, commission percentage, nature, and type of material to be sold." The obligation to pay the commission did not arise until orders were received, shipped, and paid for. *Kas Oriental*, 394 N.J. Super at 280–81. Unlike the relationship between China Falcon and Dassault Jet, the oral contract did not contain an explicit termination date, but the trial judge concluded that it was terminable at will, as was the custom in the industry. *Id.* Noting that "[i]t is a well-settled rule that an express contact excludes an implied one" and "[a]n implied contract cannot exist when there is an existing express contact about the identical subject," the appellate court held that the award of post-termination commissions was inconsistent with the terms of the express contract. *Id.* at 286–88. Similarly, while there has not been evidence presented of the custom of the industry of aircraft sales, we do have two express contracts (the FFA, SRA, and their amendments), which governed the relationship between the parties. Both of them had expiration dates. Both provided that China Falcon could collect commissions, but limited that entitlement to specific Dassault aircraft sold to

specific companies in a particular territory. As to certain of the transactions that fell outside of the scope of the FFA or SRA, the parties entered into transaction-specific agreements. Because of the explicitness of these contracts, China Falcon is not able to make a claim for commissions on sales that fell outside of the scope of the contracts.

I will therefore grant summary judgment for the claim of quantum meruit.

### e. Unjust Enrichment

Under New Jersey law, to prove a claim for unjust enrichment, "a party must demonstrate that the opposing party 'received a benefit and that retention of that benefit without payment would be unjust.'" *Thieme v. Aucoin-Thieme*, 227 N.J. 545, 557 (2016) (quoting *Iliadis v. Wal-Mart Stores, Inc.*, 191 N.J. 88, 110 (2007). This doctrine of quasi-contract also requires that plaintiff show that it expected remuneration from the defendant at the time it performed or conferred a benefit on defendant and that the failure of remuneration enriched defendant beyond its contractual rights. *Id.* (quoting *Iliadis*, 191 N.J. at 110); *see also Ebner v. Statebridge Co., LLC*, No. 16-8855, 2017 WL 2495408, at *9 (D.N.J. June 9, 2017) (noting that restitution for unjust enrichment is an equitable remedy and only available when there is no express contract providing for remuneration).

As with its quantum meruit claim, China Falcon claims that it provided benefits to Dassault Jet in the form of "the typical services of a broker," which allowed Dassault Jet to sell the four aircraft at issue for over $170 million all together. (Pl. Opp. at 39–40). China Falcon claims it was expected to receive remuneration in the form of commissions from these sales. (*Id.* at 40.) Dassault Jet argues that China Falcon has made no attempt to show the fair and reasonable value of its purported services to Dassault Jet and points to the explicit agreements, in the form of the FFA, the SRA, and their amendments, as evidence of agreements governing their relationship and thus barring relief. (Def. Br. at 28.)

China Falcon has failed to show how the retention of the services it provided to Dassault Jet would be unjust. China Falcon was not just the sales representative for the four aircraft in dispute. *See supra* Section I (detailing the contractual sales relationship between China Falcon and Dassault Jet that extended to sales of aircraft besides the four at issue). The marketing and sales efforts, directed at repeat players (particularly Minsheng and its subsidiaries), are not necessarily attributable to a particular transaction. The contracts, by their nature, contemplated that not all of China Falcon's efforts would bear fruit in the form of commissions. China Falcon in its briefing did not show which of its particular "services" were rendered exclusively for those four sales. It asserts, often in vague terms, that it aided Dassault Jet in some capacity and that actual sales followed. That these efforts may have had some connection to the sale of (other) aircraft past the expiration dates of the two agreements is not sufficient to sustain a claim that Dassault Jet unjustly enriched itself at China Falcon's expense.

I will therefore grant Dassault Jet's motion for summary judgment as to the claim of unjust enrichment.

## III.   Conclusion

For the reasons set forth above, the defendant's motion for summary judgment is **GRANTED IN PART** and **DENIED IN PART**. It is **GRANTED** as to the breach of contract claim for the sales of s/n 721, s/n 212, and s/n 244, to the claim for quantum meruit, and to the claim of unjust enrichment. It is **DENIED** as to the breach of contact claim for the sale of s/n 141. It is **DENIED** as to the claim for the breach of the implied covenant of good faith and fair dealing regarding s/n 212 and s/n 244.

The claims that remain, then, are the following:

s/n 141 breach of contract.

s/n 212 and s/n 244 good faith and fair dealing.

An appropriate order accompanies this opinion.

Dated: May 8, 2017

**Kevin McNulty**
**United States District Judge**